ETDH ASSOCIATES, et al., Appellants,

v.

WATERFALL VENTURES,
LLC, Appellee.

No. 05–CV–1339.

District of Columbia Court of Appeals.

Argued May 9, 2007.

Decided July 1, 2010.

Marta Bertola, Washington, DC, for appellants.

Donald R. Dinan, Washington, DC, for appellee.

Before RUIZ and FISHER, Associate Judges, and NEBEKER, Senior Judge.

RUIZ, Associate Judge:

Appellants, ETDH Associates ("ETDH") and 6425 14th Street, N.W., LLC ("LLC"), for the second time appeal the trial court's judgment in favor of appellee, Waterfall Ventures, LLC ("Waterfall"), which enforced a lien for delinquent water and sewer charges and calculated the overdue principal to be $101,295.29, with interest of one percent compounded monthly (which as of the time of trial in 2004 nearly equaled the principal amount, and continues to accrue), and awarded $84,708.88 for appellee's attorney's fees.[1] Per sections I. and II. A–D of Judge Ruiz's opinion, we hold that the lien for water and sewer services is enforceable against appellants, that attorney's fees are recoverable pursuant to D.C.Code § 34–2407.02(a), and that the trial court did not err, either in finding that the required notice was given to appellant before the filing of the appellee's complaint, or in determining the amount of attorney's fees due. Judge Fisher files an

---

1. This case was previously before us on appeal of the trial court's grant of summary judgment in favor of appellee, which fixed the amount of the water and sewer lien, without explanation, at $175,556.43. We vacated the summary judgment order and remanded the case. *See ETDH Assocs. v. Waterfall Ventures, LLC,* No. 02–CV–1172 (D.C. Oct. 22, 2003). The terms of our remand are discussed *infra.*

opinion with respect to the amount of the lien, in which Judge Nebeker concurs. Thus, Part I through Part II. D of Judge Ruiz's opinion and the opinion of Judge Fisher together constitute the opinion of the court, affirming the judgment of the trial court. Judge Ruiz has filed a partial dissent, and would remand the case for recalculation of the principal amount due on the lien.

## I.

The water and sewer fees at issue relate to an apartment building that had been abandoned, located at 6425 14th Street, N.W. Appellant ETDH became the record owner of the property in 1979. On July 8, 1983, the District of Columbia filed a "Certificate of Delinquent Water/Sewer Service Charges" with the Recorder of Deeds based on unpaid water and sewer services provided to the property in the amount of $6,384.22. The certificate, however, erroneously listed Procenko Real Estate, the property's management company, as the record owner.

On January 16, 1985, the District of Columbia held a tax sale for the property to recover unpaid property taxes. *See District of Columbia v. Mayhew*, 601 A.2d 37, 40 (D.C.1991). When no one bid on the property at the tax sale, the District purchased the property, and on June 3, 1988, issued itself a tax deed and took possession of the building. *Id.* This court, however, voided the tax sale and deed because the District had failed to provide adequate notice of the tax sale to ETDH, the owner of record. *Id.* at 45. Pursuant to our decision, the District subsequently deeded the property back to ETDH by a "Deed of Correction," dated October 12, 1993.

On January 6, 1999, the District of Columbia Water and Sewer Authority ("WASA")[2] assigned the lien against the property based on the outstanding water and sewer charges to Breen Capital Investment Corporation ("BCIC"). The property again accumulated unpaid property taxes, and the District held a tax sale and issued a tax deed on October 5, 2000, to appellant 6425 14th Street, N.W., LLC. After LLC paid the overdue real property taxes, the tax deed was recorded on October 12, 2000.[3]

Although the property tax bill was satisfied, the delinquent water and sewer charges remained unpaid. On July 19, 2001, BCIC, as assignee of the water and sewer lien, filed a complaint in Superior Court against appellants to determine the amount due for the delinquent water and sewer charges, and for forfeiture of the property to collect the amount secured by

---

**2.** As discussed *infra,* the Council of the District of Columbia created WASA in 1996 as an "independent authority of the District government." D.C.Code § 34–2202.02(a) (2001); *see District of Columbia Water & Sewer Auth. v. Delon Hampton & Assocs.,* 851 A.2d 410, 412 (D.C.2004). Prior to WASA's existence, water and sewer services were managed by the D.C. Public Works, Water and Sewer Utility Administration ("WASUA"). *See Dingwall v. District of Columbia Water & Sewer Auth.,* 800 A.2d 686, 691 (D.C.2002). For convenience, we refer to both as "WASA."

**3.** Although the matter is not entirely clear, appellants' counsel represented at oral argument that Vincent Abell, principal of 6425 14th Street, N.W., LLC, bought out the other partnership interests of ETDH, making LLC the sole partner in ETDH. Counsel represented that the District's tax deed to the LLC also was later invalidated because the District again failed to give ETDH proper notice. Thus, unable to acquire the property outright through the tax sale, Vincent Abell—through the LLC—acquired it by buying out the partnership interests in the title owner, ETDH. Counsel represented that ETDH, owned by the LLC, remains the title owner of the property.

the lien, plus attorney's fees.[4] After filing suit, BCIC assigned the lien to appellee, Waterfall, on June 27, 2002; Waterfall was substituted as plaintiff in the trial court.

On September 7, 2002, the trial court granted summary judgment to Waterfall, and determined that the amount of the water and sewer lien was $175,556.43. Appellants appealed, and on October 22, 2003, we vacated the summary judgment and remanded the case for the trial court to reconsider three issues:

(1) [W]hether there is an outstanding water and sewer lien relating to the premises located at 6425 14th St., N.W., for which 6425 14th St., N.W., LLC is responsible.

(2) If such a lien exists, what is the outstanding amount of the lien, the interest, and the penalties, and how were those sums calculated.

(3) Whether [Waterfall] is entitled to attorney's fees or costs, and if so, what is the basis for those fees (*e.g.*, statutory, contractual, or other) and the amount that should be awarded (with a specification as to how any such sums were calculated).

*ETDH Assocs.*, No. 02–CV–1172, order at 3–4.

On remand, the trial court held a hearing and, in an order issued on April 15, 2004, found that there was a water and sewer lien on the property "for which the record owners, including 6425 14th Street LLC are responsible,"[5] and that the assignments of the lien from WASA to BCIC and from BCIC to Waterfall had been recorded. The court found that Waterfall could recover fees and costs under D.C.Code §§ 34–2407.02(a) and 47–1403.4(h) (2001), but did not determine the amount of the lien or of the fees and costs at that time. On October 11, 2005, after having heard testimony and reviewed documents concerning the water and sewer account for the property, the trial court redetermined the amount of the lien for water and sewer services from the $175,556.43 it had previously determined (as of September 2002), to $101,295.29 in principal as of that date, plus interest of one percent compounded monthly, for a total of $193,168.05 as of May 2004 (with continuing interest compounding monthly at 1%).[6] The trial court also concluded

---

4. In addition to appellants, the complaint named several other persons and entities; the complaint was dismissed as to them by consent.

5. As discussed in note 3, *supra*, counsel for appellants represented to the court that ETDH remains the owner of record, but that Mr. Abell, through 6425 14th Street N.W., LLC, is the real party in interest.

6. Pursuant to D.C.Code § 34–2110(a), unpaid water and sewer bills incur an additional charge of ten percent after thirty days, and, after sixty days, a penalty of one percent, compounded monthly. *See id.* ("The Council of the District of Columbia is hereby authorized, in order to encourage the prompt payment of the sanitary sewer service charge imposed by this subchapter, to impose an additional charge of 10% for any sanitary sewer service charge remaining unpaid for

more than 30 days, impose a penalty at the rate of 1% per month compounded monthly for any sanitary sewer service charge that remains unpaid for more than 60 days...."). The ten percent penalty was included in the principal amount of $101,295.29. For the amount owing on the one percent compounded monthly penalty, the court relied on the testimony of appellee's witnesses, Michelle Tisot and Brian McQuade. Both witnesses testified concerning the calculation of compound interest at two points in time, August 2001 and May 2004, and the court adopted their calculations in its order:

The principal amount of the lien sold to BCIC was the $101,295.29 shown on the water billing information report....

....

The interest on the account was $39,140.36 as of August 25, 2001 for an accumulated balance of $140,435.65.

that Waterfall was entitled to attorney's fees in the amount of $84,708.88.

Appellants challenge the trial court's judgment, arguing that the trial court erred in (1) finding them liable on the lien, (2) calculating the lien amount, and (3) awarding attorney's fees to appellee. The parties before this court are the owners of the property (appellants ETDH and its sole partner, 6425 14th Street, N.W., LLC), and the lien holder (appellee Waterfall, BCIC's assignee).

## II.

### A. WASA's Authority to Sell and Assign the Lien

Appellants first argue that WASA lacks the authority to sell the lien for delinquent water and sewer charges. As a result, according to appellants, WASA's assignment of the lien to BCIC was invalid, and BCIC had no interest in the delinquent water and sewer charges on the property that it purported to assign to Waterfall. We disagree that WASA's assignment of the lien exceeded its authority.[7]

WASA was created by statute in 1996 and its powers are statutorily defined. *See District of Columbia Water & Sewer Auth. v. Delon Hampton & Assocs.*, 851 A.2d at 412. WASA has the power to "acquire, by purchase, gift, lease, or otherwise, and to own, hold, improve, use, *sell,*

convey, exchange, transfer, lease, sublease, and dispose of *real and personal property of every kind and character, or any interest therein,* for its corporate purposes." D.C.Code § 34–2202.03(5) (2001) (emphasis added). Moreover, we interpret the grant of authority broadly, as the legislature has made clear that WASA may "undertake any public project, acquisition, construction, or any other act necessary to carry out its purposes." *Id.* at § 34–2202.03(13). We, therefore, conclude that WASA was authorized to assign its lien for delinquent water and sewer charges to BCIC, which subsequently assigned it to appellee Waterfall.

### B. Is the Lien Enforceable?

The statute that governed the District of Columbia Water and Sewer Utility Administration ("WASUA"), WASA's predecessor agency, provided that "[t]he District shall have a continuing lien for water charges upon any land and the improvements thereon to which water or water service is or has been furnished." D.C.Code § 43–1529(a) (1981). Unlike the current statute, the statute in force in 1983 when the lien was filed had no recordation requirement as a condition to the lien. *Cf.* D.C.Code § 34–2407.02(a)(2) (2009 Supp.) ("Upon filing, the certificate of delinquency shall constitute a continuing lien against the real property. . . .").[8] Appellants ar-

---

The accumulated balance on an original corpus of $140,435.65 beginning September 1, 2001 through May 2004 is $193,168.05.

. . . .

The outstanding water and sewer lien on the property as of May 2004 is $193,168.05. Interest continues to accumulate at 1% per month compounded monthly.

7. Although WASA's assignment to BCIC is part of the record, the "Purchase and Sales Agreement" referred to in the assignment is not. Therefore, it is unclear whether WASA

assigned the lien to BCIC outright, or did so to enable it to act as a collection agent. See *infra* note 20.

8. The revised statute that is in force today provides in full:

(a)(1) Except as provided in subsections (c) and (d) of this section, if an owner of real property fails to pay District water and sanitary sewer service charges in full accordance with § 34–2407.01, for all bills rendered which remain unsatisfied for 60 days or more the Mayor may file a certificate of delinquency with the Recorder of Deeds.

gue that "there [was] no perfection [of the lien] and no cause of action for foreclosure" on the lien can be maintained because the "Certificate of Delinquent Water/Sewer Service Charges" issued with respect to the property erroneously listed Procenko Real Estate, instead of the actual record owner, ETDH, and did not list the square and lot numbers of the property. We find no merit to this argument.

■ That the certificate erroneously listed the property's management company instead of the record owner does not necessarily invalidate the lien or render it unenforceable. The statute plainly provided—and continues to provide—that a lien for delinquent water and sewer charges runs with the land. *See* D.C.Code § 43-1529(a) (1983) (referring to a "continuing lien" that shall be imposed "upon any land and the improvements thereon"); D.C.Code § 34-2407.02(a)(1) and (2) (2009 Supp.) ("[T]he certificate of delinquency shall constitute a continuing lien against the real property ...." such that *whoever* is "an owner" of the property is responsible for the full amount owed. (Emphasis added.)). Moreover, the certificate issued in 1983 itself "certif[ies] that ... the District of Columbia has a continuing lien for delinquent water/sewer service charges *upon the land* and the improvements thereon *at the above service address.*" (Emphasis added.) Thus, by the terms of both the statute and the certificate, the lien attaches to a particular property and is not specific to the owner of that property. Therefore, because the lien attaches to the property, ETDH, all subsequent owners are responsible for the delinquent

(2) Upon filing, the certificate of delinquency shall constitute a continuing lien against the real property and show the amount of unpaid charges for District water and sanitary sewer services. The continuing lien shall be for the current full amount of the unpaid water and sanitary sewer service charges, penalties, interest, and administrative costs.

(3) The Mayor may enforce the lien if any water and sanitary sewer service charges remain unpaid for more than 180 days from the date the bill is rendered or for more than 15 days after a final decision of an appeal challenging the bill, whichever is later in the same manner that real property tax liens are enforced pursuant to Chapter 13 and Subchapter IV of Chapter 13A of Title 47.

(4) The real property may be sold for the unpaid water and sanitary sewer charges, penalties, interest and administrative costs at a tax sale in accordance with the provisions for the sale of property for delinquent real property taxes pursuant to Chapter 13 of Title 47.

(5) If any real property sold for unpaid water and sanitary sewer service charges is not redeemed by the owner within 180 days from the date of sale, including payment of 2% interest for each month until the property is redeemed, the Mayor shall furnish a deed to the purchaser or holder of the certificate of sale in accordance with § 47-1304.

(6) Proceeds from the sale that represent unpaid water charges shall be credited to the Water and Sewer Enterprise Fund of the District of Columbia as established by § 47-375(g).

(b) A lien for water and sanitary sewer charges shall have priority over any other lien, except a lien for District taxes. The lien for water and sanitary sewer service charges shall remain in effect until the charges set forth in the certificate and any accrued additional charges, interest, penalties, and administrative costs are paid in full. Upon final payment of any delinquent charges, penalties, interest, and administrative costs, the Mayor shall file promptly a certificate of satisfaction with the Recorder of Deeds.

(c) The Mayor may defer or forgive, in whole or in part, any water and sanitary sewer service charges due the District for any qualified real property pursuant to § 6-1503.

(d) The Mayor shall not sell the residence of an owner who occupies a single family home for failure to pay District water and sanitary sewer charges in accordance with subsection (a) of this section.

D.C.Code § 34-2407.02 (2009 Supp.).

charges *vis à vis* the lien holder. Nor does the absence of the square and lot numbers for the property in the certificate of delinquency render the recorded lien unenforceable.[9] The statute does not make that a requirement of the lien, and the certificate that was filed clearly states that the lien shall be placed "upon" the listed "service address." The listed "service address," in turn, identifies appellants' property located at 6425 14th St., N.W. Furthermore, the certificate, which is a form document containing blanks for the District to fill in, does not include a demarcated space for either the lot number or the square number of the property. Appellants do not point to any mistake on the certificate, other than the mistaken listing of the management company as the owner.

Moreover, we note that unlike the current WASA statute and regulations, see *supra* notes 8 and 9, or other statutory schemes, the statute in force in 1983 did not make filing a requirement of enforceability. *Cf.* D.C.Code § 40–301.02 (2001) (requiring notice of intent to enforce a mechanic's lien that complies with specific statutory items); *McNair Builders, Inc. v. 1629 16th Street, L.L.C.*, 968 A.2d 505

(D.C.2009) (holding that notice of mechanic's lien was defective because it did not name the correct owner of the property).

Here, there is no dispute that the certificate of delinquency was filed with the Recorder of Deeds. In opposing summary judgment, appellants argued that they were not on notice of the recorded lien because it did not show up in a title search—a claim appellee contests in light of the due diligence they conducted, which did reveal the lien.[10] We need not decide whether notice to the owner of the water and sewer lien on the property was legally required as a condition of the 1983 lien's enforceability, because the record demonstrates that appellants were given notice of the delinquent charges and the ensuing lien. Appellant ETDH acquired ownership of the property in 1979, before the certificate of delinquency, dated July 8, 1983, was filed. It was made aware of the overdue charges[11] because the certificate of delinquency, which erroneously listed "Procenko Real Estate" as the "owner," was nevertheless sent "[Care Of:] ETDH Assoc[iates]" and clearly identified the service address as the one for the property

---

**9.** Regulations relating to "real property liens and tax sale," that were promulgated in 1993 and amended in 1999, describe the contents of the written notice that WASA must provide to owners before it files a lien. WASA is not required to include the square and lot numbers. 21 DCMR § 427 provides in relevant part:

 427.1 When bills for water and sewer service charges, meter maintenance and repairs, or sanitary sewer services are more than sixty (60) days overdue, WASA shall provide the owner of record with a written notice of intent to file a lien.
 427.2 The written notice shall state the following:
 (a) The outstanding balance;
 (b) A notice that if the bills are not paid in full or payment arrangements are not made within ten (10) working days of the date of the notice, a certificate of delinquency shall

be filed by WASA with the Recorder of Deeds;
 (c) That a certificate of delinquency shall constitute a lien against the real property; and
 (d) The owner of a single family home has the opportunity to present evidence that he or she occupies the premises.
21 DCMR § 427 (2010).

**10.** According to appellants' counsel's oral argument, at the time the only way to conduct a search of the land records was through the grantor-grantee index and lot/square number index.

**11.** The record does not explain whether the overdue water charges listed on the certificate of delinquency were incurred before or after ETDH acquired ownership of the property.

ETDH owned.[12] Appellant 6425 14th Street, N.W., LLC was put on at least inquiry notice of the lien by WASA's assignment of the lien to BCIC, which was recorded prior to the tax sale in 2000, when the LLC obtained an interest in the property. The recorded assignment of lien included the registration number of the 1983 certificate of delinquency. With notice that a lien had recently been assigned, the underlying lien itself should have been discovered as part of routine due diligence in purchasing the property at a tax sale. Because of the identity of interest between appellants, see *supra* note 3, the notice that each had is fairly imputed to the other.

## C. Merger

■ Appellants also challenge the validity of the lien by making two related merger arguments. First, invoking the "general rule of law that when a greater and lesser estate meet in the same person, the lesser is merged in the greater, 28 AM. JUR.2D *Estates* § 423," appellants argue that when the District of Columbia acquired a deed on the property in 1988, the lien was extinguished, in effect, because the District was both the lien-holder as well as the property owner responsible for the charges. Second, appellants argue that the acquisition of property by a governmental body extinguishes all government liens on the property because the government cannot owe money to itself,

citing 72 AM.JUR.2D *State & Local Taxation* § 802.

■ We disagree with appellants that the District's acquisition of the property in 1988 extinguished the water and sewer lien held by WASUA, then an integral part of the District government structure.[13] First, we note that the District's acquisition of the property was declared "null and void" by this court in 1991 in *Mayhew*, 601 A.2d at 39. Therefore, as a matter of law, the District never owned the property, and pursuant to the Deed of Correction issued in 1993, title was reinstated to ETDH as owner of the property. Moreover, the trial court found that the District was responsible to pay for the water bills it incurred, *i.e.*, during the time, from 1988–1993, when it had possession of the property before this court voided the tax deed to the District. This finding is fully supported by the testimony of Ms. Tawana Schooler, a WASA (and formerly WASUA) representative. Even if we assume, without deciding, that appellants correctly recite the majority view of the common law concerning merger of title, it is inapplicable here because the District was not, as a matter of law, the owner of the property; in any event, as a matter of fact the District was liable to pay water bills for service to the property during the time it had possession.[14] Accordingly, we conclude that the District's acquisition of the property at a tax sale—later voided—did not extinguish the water and sewer lien.

---

12. Thus, we are not dealing with a third party purchaser who would need to rely on a title search to have notice of the lien.

13. WASA, an entity separate from the District, was not created until 1996. See *supra* note 2.

14. We note that we are governed by the statute, which as already discussed, expressly provides that a water and sewer lien "shall constitute a continuing lien against real prop-

erty." D.C.Code § 34–2407.02(a)(2) (2009 Supp.). A specific statutory provision supersedes a contrary common law principle, *see, e.g., Francis v. United States*, 715 A.2d 894, 901 (D.C.1998), as recognized in the treatise relied upon by appellants. *See* 72 AM.JUR.2D *State & Local Taxation* § 802 (noting that liens are extinguished upon acquisition of the property by a governmental entity, "[u]nless otherwise provided by statute").

## D. *Attorney's Fees*

Appellants argue that the trial court erroneously awarded attorney's fees, taking issue with both the statutory basis for the fee award and appellee's entitlement to the fees awarded in this case. We agree with the trial judge that the WASA statutory scheme permits the award of attorney's fees, and conclude that the trial court did not err in finding that appellee gave notice to appellants before filing suit, as required by the statute.

Although the WASA statute does not itself have a specific provision stating that attorney's fees may be awarded in foreclosure actions to enforce water and sewer liens, the statute provides that water and sewer liens may be collected "in the same manner as real property tax liens . . . pursuant to Chapter 13 and Subchapter IV of Chapter 13A of Title 47." D.C.Code § 34–2407.02(a)(3) (2009 Supp.). The real property tax lien statute, in turn, provides that "the court may award counsel fees" in foreclosure actions. *Id.* at § 47–1303.04(h)(1) (2001). Accordingly, the trial court was authorized to award attorney's fees incurred to enforce appellee's lien.

The statute also provides, however, that "no counsel fees shall be allowed unless, *prior to the filing of the complaint,* the plaintiff shall have given not more than 120 nor less than 30 days written notice . . . of intention to file such complaint." D.C.Code § 47–1303.04(h)(1) (emphasis added). The trial court found that "[a] timely 30–day notice letter was sent by registered mail to 6425 14th Street, N.W.,

LLC." We are bound by the trial court's factual finding, unless it is clearly erroneous or there is no evidence to support it. *See, e.g., Nat'l Hous. P'ship v. Mun. Capital Appreciation Partners I, L.P.,* 935 A.2d 300, 319–20 (D.C.2007). Appellee presented evidence that notice was given by certified letter.[15] Mr. Abell denied ever receiving the letter, which was shown to him by appellee's counsel during cross-examination, although he acknowledged that the letter was addressed to him personally as "registered agent" and had his office address on the letter. Appellants argued to the trial court and reiterate on appeal, that the letter lacks "evidentiary weight" because the letter purportedly sent to Mr. Abell did not bear any authentication by the post office to prove that it was sent by certified mail, whereas the notices sent to other parties with a possible interest in the property (*e.g.,* former partners of ETDH, see *supra* note 3) have a post office stamp. Moreover, the letter addressed to Mr. Abell, while identical in form and content to the other notices, has a different date (May 10, 2001), whereas the letters to the other parties are dated a month before (April 10, 2001). While we recognize that these factors could have given the trial court pause about the authenticity of the exhibit and led the court to find that the required notice was not given, we cannot say that the court's finding that notice was given to appellants is clearly erroneous or without evidence to support it.

Finally, appellants challenge the amount of attorney's fees awarded.[16]

---

**15.** Appellee's brief refers to a document in the appendix provided to the court ("R.62"), but that document is an affidavit of service to Mr. Abell on August 28, 2001, of the initial order, summons, and complaint, and is not the one that is contemplated by the statute. The trial court record, however, contains an "Exhibit C" that is a letter dated May 10, 2001, which

gives appellants thirty days to pay the delinquent lien. *See* D.C.App. R. 10 ("The following items constitute the record on appeal: (1) the original papers and exhibits filed in the Superior Court. . . .").

**16.** Fees were awarded in the amount of $84,708.88, of which $13,888.64 (for BCIC's

Their primary claim is that no fees should be awarded for legal work done after July 12, 2001, when the motion for summary judgment was filed by appellee.[17] It was the grant of summary judgment that led to the first appeal in this case and to this court's remand in 2003 to reconsider the motion for summary judgment. See *supra* note 1. Appellants' complaint is that appellee did not submit evidence of the amount due on the lien or its attorney's fees until after the hearing on remand, held in 2004, and that if appellee had submitted that evidence earlier, the matter would have been resolved. The record belies their claim. The redemption value on the lien that appellee claimed was included in appellee's motion for summary judgment and mentioned in this court's 2002 order remanding the case for further consideration. Appellants' challenges in this appeal to WASA's authority to assign the lien and the lien's enforceability, moreover, do not indicate that appellants were willing to resolve the dispute. Appellants' subsidiary challenges to specific items in the attorney's fee request were rejected by the trial court, which credited the affidavits filed by appellee's attorneys and found the requested amount reasonable. *See Saga-*

*lyn v. Found. for Preservation of Historic Georgetown,* 691 A.2d 107, 115 (D.C.1997) ("The determination of reasonableness of attorney's fees lies within the trial court's sound discretion.").

### E. *Amount of the Lien* [18]

Although the water and sewer lien against the property is valid and is enforceable against the owner, I agree with appellants that the matter must be remanded again for a redetermination of the principal amount due on the account secured by the lien. When we vacated the summary judgment order in the first appeal, our order asked that the trial judge not only determine "the outstanding amount of the lien, the interest and the penalties," but also explain "how ... those sums [were] calculated." On remand, the court found that the amount due was $101,295.29 (plus the accrued penalty of 1% compounded monthly, see *supra* note 6), and, by way of explanation, said that "[t]he total amount outstanding was calculated by counting backwards from the date of the sale to the date of the last paid bill, in this case, a partial interest payment on October 25, 1991."[19] Appellants argue

---

attorneys) had been included in the price Waterfall paid for assignment of the lien.

17. Appellants make the same argument with respect to the award of interest on the lien. As noted, see *supra* note 6, the statute clearly provides that overdue water bills incur a 1% monthly penalty after sixty days of nonpayment.

18. Judges Fisher and Nebeker do not join this part of Judge Ruiz's opinion. See separate opinion of Judge Fisher, *infra*, in which Judge Nebeker concurs.

19. We are unsure why the period was so limited, but it appears to be based on the "Purchase and Sales Agreement" between WASA and BCIC when the lien was assigned in 1999, which is not part of the record. See

*supra* note 7. WASA assigned to BCIC "all of its right, title, and interest" in the lien relating to the property, as "more particularly described in Certificate of Delinquent Water/Sewer Account No. 02–173778–000–7." According to the evidence, however, WASA and BCIC agreed to limit the right to collect on the account from "October 25, 1991." Ms. Schooler's testimony—that "the contract was agreed upon that [WASA] would only [go] back ten years"—is the only evidence that the lien was time-limited. The trial court appears to have been confused by her testimony, and conducted its own inquiry of the witness:

[The Court]: Before I call on opposing counsel, you said that your account with BCIC only allowed you to go back to 1991, could give me a—
[Ms. Schooler]: The contract—

that "counting backwards from the date of the sale"—WASA's sale of the lien to BCIC on January 6, 1999—to the "date of the last paid bill on October 25, 1991," is not a proper method to calculate the amount that the owner must pay to discharge the lien on its property because it took into account only the charges incurred on the account, but not payments that have been made to the account.

The record on appeal supports appellants' claim. Appellee's witness, Ms. Schooler, who worked for WASA as a collections analyst, testified that the principal amount of the lien was $101,295.29. She described the WASA billing record for the property that was admitted into evidence. That billing record spanned from January 13, 1988, to March 2, 2000; WASA's records for the account did not go back before 1988. According to the billing record, the amount due on the account as of March 2, 2000, was $101,295.29. Ms. Schooler explained that the principal amount due on the lien of $101,259.29, the exact amount due as of March 2, 2000, was "a running total" of *charges* during the period January 29, 1992, to January 7, 1998, the period covered by the lien, but did "not use payments.... It was just bills that were rendered." [20] Her testimony is corroborated by the WASA billing record

[The Court]:—little more background information of what you're referring to?

[Ms. Schooler]: Well, because they [BCIC] were going to be collecting for us, the accounts that were more than—probably like ten years old really aren't collectible, so they wouldn't be able to collect on them. They wouldn't be worth collecting, actually. So the contract was agreed upon that we would only [go] back ten years, and that was 1991 in this particular case.

[The Court]: So your agreement with BCIC was with respect to accounts that you sold to them ... the calculations would be based on figures from 1991 forward and not further back than 1991?

[Ms. Schooler]: Right.

Such a limitation could have been based on what the parties understood to be the applicable statute of limitations. *See New 3145 Deauville v. First Am. Title Ins. Co.*, 881 A.2d 624, 629 (D.C.2005) ("WASA is subject to the statute of limitations with respect to that portion of the outstanding debt of New Deauville to WASA to which the statute of limitations could constitute a defense." (quoting *Whitener v. WMATA*, 505 A.2d 457, 458 (D.C.1986))). There is no indication that appellants asserted a statute of limitations defense, *see Feldman v. Gogos*, 628 A.2d 103, 104 (D.C.1993) ("[T]he statute of limitations is an affirmative defense which, under [Super. Ct. Civ. R.] 8(c), 'must be set forth affirmatively in a responsive pleading,' and may be waived if not promptly pleaded."), so the ten year limit (which appellees have not challenged) appears to be based on the contract.

20. Ms. Schooler was repeatedly asked about the payments reflected on the WASA billing report and she consistently stated that she did not take those payments into account in calculating the principal amount due on the lien.

(Cross Examination)

[Ms. Schooler]: [T]here also have been payments on this account, which would have reduced the bill. Because there are payments on this account. The tape that I ran only gave you the bills that were rendered. It didn't include any kind of payments that were made.... there are payments made, which aren't included on my tape.

....

Q: Those are payments that were made on the account?

A. Yes.

Q. Were those taken into consideration in your tape Plaintiff's Exhibit Number 4?

A. Yes.

Q. Where do those appear as a credit, Ms. Schooler?

A. I don't—no, they were not. And I think that's what I said before. I did a running total. I did not use payments in this tape. It was just bills that were rendered. We didn't use the—we didn't take out the payments, no, we didn't.

....

A. That's the balance we came up with.

Q. But it doesn't include the payments for the account in the right hand side column?

A. The tape doesn't include—no, the tape that I ran does not include the payments.

and a copy of the calculator tape she generated which adds up only the charges during the relevant period, for a total of $101,295.29. Therefore, neither Ms. Schooler's testimony, see *supra* note 21, nor the documentary evidence support the trial court's finding that "[a]ll payments made on the account were credited and reflected in the total balance of $101,295.29." Even assuming that the amount calculated by Ms. Schooler accurately reflected the total charges accrued during the limited time period covered by WASA's assignment of the lien (1991–1999), the amount that the owner would have to pay to discharge the lien on the property would be the sum of those charges *less* payments that have been made to the account that properly should be credited to those charges.

BCIC (and now, Waterfall) is entitled to receive what it bargained for when it purchased from WASA the right to enforce the lien on the property's delinquent account. That, it appears from the record, is limited to charges made during a particular time period, which were calculated by Ms. Schooler.[21] But whether or not the parties to the lien assignment agreed that the only *charges* that could be collected were limited to a ten-year period preceding the assignment, appellants are entitled to an offset against these charges for *payments* on the account in calculating the amount due by appellants to discharge the lien. As we have discussed, the lien is an obligation that runs with the land, so the amount needed to discharge it is not dependent on who makes the payments.[22] Both WASA's assignment to BCIC and BCIC's to Waterfall recognize that the property owner may redeem the lien by paying it off, which can only be done after calculating the "amount owing" on the account.[23] Therefore, to determine the "amount owing" by the owner to discharge

---

21. Referring to the water billing report itemizing the charges, fees, and payments on the account spanning from March 1988 to December 2000, Ms. Schooler testified that to arrive at the $101,295.29 balance, she "started it with the charges from the penalty on line 12 [of the billing statement, dated February 17, 1998] of [$]440.49 and we calculated all the way back to line 65 [dated December 2, 1991]." She explained that the balance was for a "ten year" period of 1991–1999, because "[t]he contract [WASA] had with BCIC Capital only allowed us to go back to 1991, so we could only do whatever balance was outstanding through that period."

22. The trial court's findings leave some room for doubt as to whether this principle was applied in this case. In its order, the trial court found:

 At all times relevant to this case, but at least starting from 1988, the District of Columbia was liable for its water bills. The defendants have failed to present any credible evidence that any water charge incurred during the District of Columbia's purported ownership was not paid. Indeed, the record reflects that during the intervals with

which this litigation is concerned, substantial payments were made on the account, which were credited against the outstanding balance. Finally, defendants have not identified any payment made by them during the interval at issue that was not credited against the outstanding balance.

 I note that WASA's billing record reflects that no payments were made during the time (June 3, 1988–October 12, 1993) that the District was in possession of the property pursuant to the later-voided tax lease. Nine payments were made on the account before the District took possession, and six payments were made after. The record does not disclose who made these payments or whether they were intended to cover particular charges on the account.

23. WASA's assignment to BCIC expressly provides that, "Said water and sewer lien interests are subject to redemption on repayment *of the amount owing*." (Emphasis added.) There is similar language in BCIC's assignment to Waterfall: "Said Water Liens are subject to redemption by the delinquent property owner on repayment *of the amounts owing*." (Emphasis added.)

the lien held by Waterfall, it is necessary to identify and deduct payments made on the account that are properly offset against the charges incurred during the period covered by the lien. The WASA billing report shows fifteen payments made on the account from September 22, 1980, to January 2, 1996, totaling $82,561.19.[24] Six of these payments, totaling $70,142.70, appear to have been made during the period the charges covered by the lien were incurred. None was taken into account by Ms. Schooler, however, in her calculation of $101,295.29 as the "amount owing."

My colleagues have accepted appellee's argument that we should "infer that these payments were applied to the oldest balances first, and that the running balance shows the amount due after payments were credited." Although that argument has some common-sense appeal, Ms. Schooler did not say that is how WASA allocates payments, and such a practice would seem counter to her testimony that the lien assignment was time-limited because charges more than ten years old "aren't collectible." See supra note 20. Moreover, the trial judge, who is the finder of fact, did not make that inference. And, even if appellee is correct that the usual practice is to allocate payments to the oldest outstanding charges, the record contradicts that this is what was done in this case.[25] If the WASA billing record, including the final amount of $101,259 is a "running total" calculated by the computer that automatically takes into account all charges and payments made to the account, the logical way to calculate what the lien secures is to take the running total that was due as of 1991 (when the permissible charges under the lien commenced) and deduct it from the final amount of $101,259. That simple calculation necessarily must yield a balance of less than the final running balance of $102,259. As appellants correctly state, it "defies both logic and mathematical reasoning" to argue, as appellees do, that the amount due to discharge the lien remains the same regardless of whether you take into account charges incurred before 1991 or not (and the WASA billing record shows that there

24. The WASA records do not show any new charges or payments after 1996.

25. According to the WASA billing report in the record, the charges and penalties before the lien period total $37,181.63. Therefore, since the payments on the account exceed that amount, even if payments were allocated to the older charges first, at least a portion of the payments should have offset the charges covered by the lien:

| | | |
|---|---|---|
| Payments | ( | 82,561.19) |
| less Pre-Lien Charges | ( | −37,181.63) |
| Amount to be Credited to lien charges | = | 45,379.56 |

At the evidentiary hearing, appellants proffered a different version of the billing history for the account, which appears to be a fax from WASA dated March 27, 2000. Ms. Schooler testified that the report had been prepared by a former WASA employee. The trial court did not admit this report into evidence because it had not been properly authenticated. As it is not part of the record on appeal, I do not consider it. See, e.g., Bynum v. United States, 799 A.2d 1188, 1190 (D.C. 2002). I note, however, that this report includes a column with a running balance, unlike the WASA billing report that was admitted into evidence. According to this report, there was already a balance due of $33,731.66 on January 13, 1988, at the inception of the period covered by the report. Ms. Schooler testified that WASA's records for this account only went back to 1988. If this report were part of the record, it would lend some support to the trial court's finding that payments were taken into account, but it still would not square with Ms. Schooler's calculation of the amount due for the period covered by the lien. The report, moreover, is inconsistent with the one that was admitted into evidence because it reflects only six payments to the account, totaling $70,142.70, rather than fifteen payments totaling $82,561.09.

were charges, penalties and interest between 1988 and 1991). This mathematical reasoning holds true whether or not payments are used to offset the older bills first. Appellees have no answer for this straightforward logical point, and instead have been stuck trying to defend (unsuccessfully in my view) what my colleagues recognize is an as-yet-unexplained and internally inconsistent rationale given to justify the final running balance of $101,259 as the amount due to discharge the lien.

Because of the contradictions in the evidence and illogic of the method used to calculate the amount of the lien, the case should be remanded again to clarify the record, and, if necessary, to recalculate the amount owing.[26]

Separate Opinion of Associate Judge FISHER, in which Senior Judge NEBEKER joins:

I join the opinion of Judge Ruiz, except for part II. E, relating to the amount of the lien. For the reasons briefly explained below, the judgment of the Superior Court is affirmed in its entirety.

 I agree that appellee has not clearly explained (at least to my understanding) why the "counting backwards" method Ms. Schooler described is an appropriate method of calculating the amount of the lien. I also agree that the record includes confusing testimony and that some of it supports appellants' argument. But the question we must answer is whether the trial court's findings are clearly erroneous, and the answer to that question is "no." *See* D.C.Code § 17–305(a) (2001) ("When the

case was tried without a jury, the court may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it."); *Washington Convention Center Authority v. Johnson*, 953 A.2d 1064, 1081 (D.C.2008) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985))).

The critical findings of Judge Dixon are these: (1) "The principal amount of the lien sold to Breen Capital was the $101,295.29 shown on the water billing information report."; (2) "All payments made on the account were credited and are reflected in the total balance of $101,295.29."; (3) "The interest on the account was $39,140.36 as of August 25, 2001 for an accumulated balance of $140,435.65."; (4) "The accumulated balance on an original corpus of $140,435.65 beginning September 1, 2001 through May 2004 is $193,168.05."; and (5) "The defendants have failed to present any credible evidence that any water charge incurred during the District of Columbia's purported ownership was not paid."

There is evidence to support each of these findings. Ms. Schooler identified Exhibit 3 (Appellants' Exhibit and Transcript Reproduction 84) as a computer-generated water billing information history that shows an outstanding balance of

---

26. We note that the WASA billing report shows a charge of $3,937.76, dated January 31, 1996, which was later voided in its entirety. However, the corresponding late fee of $393.78, does not appear to have been similarly deleted and is included in Ms. Schooler's calculation of $101,295.29 as the total of charges incurred during the lien period.

There is also an unexplained charge of $69.93 added by hand to the computerized billing report and calculator tape. We leave it for the trial court, on remand, to verify the total amount of the charges, plus the applicable interest penalties, as well as determine what payments, if any, should be taken into account.

$101,295.29. (Appellants' Exhibit and Transcript Reproduction 92.) She also testified that that was the amount of money owing on the water and sewer bill when it was sold to Breen in 1998. (*Id.* at 98.) The computer "does the calculations" and that number would reflect the amounts paid on the bill. (Appellants' Exhibit and Transcript Reproduction 104; Appellees' Exhibit and Transcript Reproduction 114.)

Exhibit 3 reflects fifteen payments ending in 1996, before the lien was sold. (It just does not make clear how these payments were applied.) I think it is fair to infer that those payments were applied to the oldest balances first, and that the running balance shows the amount due after payments were credited.

Michelle Tisot, a representative of Breen, testified that Breen purchased a lien in the amount of $101,295.29. (Appellees' Exhibit and Transcript Reproduction 115.) She also identified Exhibit 5, a computer record from Breen showing that principal amount. (Appellants' Exhibit and Transcript Reproduction 89.) She had added the principal and interest as of August 29, 2001, to reach the sum of $140,435.65. (Appellees' Exhibit and Transcript Reproduction 116.) Mr. McQuade, an expert witness for Waterfall, testified that the accumulated balance on a corpus of $140,435.65, computed at the rate of one percent per month compounded, as of May 13, 2004, was $193,168.05. (Appellees' Exhibit and Transcript Reproduction 117–18.)

I agree that Ms. Schooler's testimony about her adding machine tape (Exhibit 4) is confusing. She said at one point that the tape "only gave you the bills that were rendered. It didn't include any kind of payments that were made." (Appellants' Exhibit and Transcript Reproduction 101.) At another point, however, she stated that the tape reflected "what's due. It is the balance that's due on the account." (*Id.* at 103.) Even if we find this testimony less than pellucid, it described the adding machine tape—an alternative method for calculating the amount of the lien sold to Breen. It does not undermine the evidence about the computer-generated balances described above. Those computer balances and the associated testimony support Judge Dixon's findings.

\* \* \* \* \* \*

For the foregoing reasons, the judgment is affirmed.

*Affirmed.*